# *Exhibit A*

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

**SHANT A. TEMIRIAN, JR.,**
    Plaintiff,

v.

**WASHTENAW COUNTY GOVERNMENT,**
    Defendant.

---

**Case No.:** 2026-221878-CD
**Hon.:** Martha D. Anderson
**Court:** 6th Judicial Circuit Court, County of Oakland
**MDCR Charge No.:** 657650
**EEOC Charge No.:** 471-2024-03514

There is no other pending or resolved civil action arising out of the transaction or occurrence alleged in this complaint. MCR 2.113(C)(2).

### <u>AMENDED PRO SE CIVIL RIGHTS COMPLAINT</u>
**JURY TRIAL DEMANDED**

### I. PARTIES

1. Plaintiff Shant A. Temirian Jr. is an individual residing at 29980 Montmorency Drive, Novi, Michigan 48377, in the County of Oakland, State of Michigan. Plaintiff's telephone number is 248-495-5688. Plaintiff's email address is omsstaff96@gmail.com. Plaintiff appears Pro Se.

2. Defendant Washtenaw County Government is a Michigan county government entity with its principal place of business at 220 North Main Street, Ann Arbor, Michigan 48104, in Washtenaw County, Michigan.

### II. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over Plaintiff's state law claims pursuant to the Michigan Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 et seq., which declares that the opportunity to obtain employment without discrimination because of race, color, national origin, sex, age, height, weight, familial status, or marital status is a civil right.

4. This Court has subject matter jurisdiction over Plaintiff's disability claims pursuant to the Michigan Persons with Disabilities Civil Rights Act (PWDCRA), MCL 37.1101 et seq.

FILED   Received for Filing   Oakland County Clerk   3/31/2026 5:59 PM

5. This action also arises under Michigan common law defamation.

6. Venue is proper in Oakland County Circuit Court pursuant to MCL 600.1621(a) because Plaintiff Shant A. Temirian Jr. resides at 29980 Montmorency Drive, Novi, Michigan 48377, which is located within Oakland County, Michigan. MCL 600.1621(a) provides that venue is proper in any county where a party to the action resides. Plaintiff resides in Oakland County. Venue in Oakland County is therefore proper as a matter of right under Michigan statute.

7. Defendant Washtenaw County Government is located at 220 North Main Street, Ann Arbor, Michigan 48104, in Washtenaw County, Michigan. Defendant is not a resident of Oakland County.

8. Plaintiff further notes that Oakland County is a neutral venue for this action. Plaintiff has documented, good-faith concerns that the political environment and institutional relationships within Washtenaw County would make a fair and impartial proceeding in Washtenaw County Circuit Court difficult. Because MCL 600.1621(a) independently establishes venue in Oakland County based on Plaintiff's residence, this concern is offered solely as additional context and is not necessary to establish proper venue.

9. This state filing preserves Plaintiff's rights under Michigan law, which does not require exhaustion of administrative remedies through the MDCR before filing in state court. Filing in this Court automatically terminates MDCR jurisdiction over Plaintiff's state civil rights claims pursuant to MCL 37.2606.

## III. STATEMENT OF FACTS

### A. Background and Professional Qualifications of Plaintiff

10. Plaintiff Shant A. Temirian Jr. is a highly credentialed and experienced IT professional with 43 years of hands-on computer experience, beginning at age five, and 17 years of professional IT experience spanning the medical, government, and automotive sectors.

11. Plaintiff demonstrated exceptional technical aptitude from an early age. At age five, Plaintiff was instructing teachers on computer use. At age thirteen, Plaintiff independently disassembled and rebuilt his first computer. At age sixteen, Plaintiff discovered a CMOS password bypass exploit in the IBM Aptiva 200 — a BIOS design flaw utilizing RAM persistence differential between warm and cold reboots — for which IBM offered Plaintiff employment.

12. At age twenty-four, Plaintiff obtained his CompTIA A+, CompTIA Network+, and Microsoft Certified Professional (MCP) certifications. Plaintiff currently holds these certifications.

13. Plaintiff has previously held the following additional certifications and credentials: Dell Certified Professional; LEIN Certified (Law Enforcement Information Network

— government and law enforcement security clearance); HIPAA Trained (medical sector compliance); GDPR Certified (international data protection); and government security clearance held during work as an IT professional for Allison Transmission, a General Motors government contractor.

14. At the time of his employment with Washtenaw County, Plaintiff was the only PC Technician on the team who had held a LEIN certification, and the only team member with prior GDPR certification. These facts are directly relevant to the pretextual nature of the disciplinary actions taken against Plaintiff.

15. Plaintiff has extensive enterprise-level security experience, with hands-on experience using multiple enterprise-grade security platforms in production environments, and possesses unique practical knowledge of the real-world performance of security appliances valued between $50,000 and $500,000.

16. Plaintiff has independently designed, developed, and prototyped a proprietary mathematical security engine supported by over 70,000 lines of technical specifications across 70+ documentation files. This body of work represents Plaintiff's professional and intellectual caliber — the same caliber that Defendant chose to defame and destroy through false disciplinary allegations and wrongful termination.

17. Plaintiff has managed his congenital PKU condition his entire life without it ever preventing him from achieving professional certifications, government security clearances, or a successful 17-year IT career across multiple sectors. This directly refutes any discriminatory stigma falsely attached to PKU patients that they are mentally disabled. The destruction of this career by Defendant's wrongful conduct is the measure of the damages Plaintiff now brings before this Court.

## B. Plaintiff's Disabilities

18. Plaintiff Shant A. Temirian Jr. is an individual with covered disabilities under the Michigan Persons with Disabilities Civil Rights Act (PWDCRA), MCL 37.1101 et seq., specifically: (a) Type 2 Diabetes Mellitus, diagnosed and documented in medical records dated January 12, 2018, Henry Ford Health, Patient ID #4882493; and (b) Classical Phenylketonuria (PKU), a lifelong congenital metabolic disorder with which Plaintiff was diagnosed at birth.

19. During the employment application process, Plaintiff indicated he had a disability.

20. Plaintiff's disabilities require, as a medical necessity, consistent scheduling to manage blood sugar and insulin levels, including a regular lunch break at a consistent time each day. This is a physiological requirement, not a preference.

21. For a patient managing Type 2 Diabetes, delayed or skipped meals cause blood glucose levels to drop, producing documented symptoms including irritability, difficulty concentrating, fatigue, and emotional dysregulation. These symptoms are foreseeable,

involuntary, and directly caused by the failure to accommodate the dietary timing needs of a diabetic employee.

22. For Plaintiff specifically, these effects are compounded by his PKU, which creates directly conflicting dietary requirements between the two conditions, making consistent meal timing the only reliable mechanism of control available to him.

23. Plaintiff did not disclose his PKU diagnosis to Defendant at any time. Defendant therefore bears no liability with respect to PKU. PKU is referenced solely to provide the Court with a complete and accurate understanding of the medical severity of Defendant's denial of diabetes accommodations as they applied to this specific Plaintiff.

## C. The Disability Disclosure and Failure to Accommodate (August 2, 2023)

24. On August 2, 2023, a workplace incident occurred involving colleagues Justin Vidaurri and Di Shi. Colleague Di Shi told Plaintiff he could skip lunch. At that time, Plaintiff disclosed to Di Shi and Justin Vidaurri — with multiple witnesses present — that he could not skip lunch because he is diabetic.

25. Defendant was directly and explicitly informed of Plaintiff's Type 2 Diabetes during the August 2, 2023 incident. The disclosure of Plaintiff's disability was made in direct response to being pressured to skip his lunch break, making the connection between the disclosure and the failure to accommodate immediate and unambiguous. (Rebuttal Statement, Section 2.6, Exhibit 8.)

26. A consistent lunch break at a regular time is a reasonable accommodation as required under the Michigan Persons with Disabilities Civil Rights Act, MCL 37.1102 and MCL 37.1201.

27. Defendant failed entirely to engage in the required interactive process following Plaintiff's disability disclosure. Neither Supervisor John Tapert, nor Human Resources, nor any representative of Defendant initiated the interactive process at any point following the August 2, 2023 disclosure.

28. Following the August 2, 2023 incident, Plaintiff reported the situation to Supervisor John Tapert. Tapert acknowledged and agreed with Plaintiff in writing on two specific points: (a) that three employees were not needed to install a printer for over three hours; and (b) that Plaintiff was entitled to take his lunch break.

29. Despite Tapert's written acknowledgment that Plaintiff was correct on both points, Tapert subsequently issued the first disciplinary action against Plaintiff on December 15, 2023 — a period of approximately four and a half months after the disability disclosure — based entirely on the hearsay accounts of colleagues Justin Vidaurri and Di Shi, the very individuals whose conduct Tapert had already acknowledged was improper.

30. The December 15, 2023 disciplinary document is titled 'Oral Warning' yet imposes a formal three-month Corrective Action Plan with progressive discipline consequences up to and including termination. This contradiction is itself evidence of procedural bad faith.

31. Plaintiff never signed the original disciplinary document to indicate agreement. When directed by his Union President Mary Campbell to sign the document, Plaintiff did so solely under duress and noted that fact explicitly in his signature, preserving his legal objection on the face of the document.

32. On at least two documented occasions, Plaintiff formally requested that all parties submit to a polygraph examination to establish the truth of the disputed facts. Defendant refused to acknowledge or respond to any of these requests.

33. Plaintiff filed a detailed 17-page Rebuttal Statement (Exhibit 8) disputing each allegation in the disciplinary action, documenting the disability disclosure, the witnesses present, and the failure of management to initiate an interactive process at any point.

**D. Protected Activity**

34. As early as May 15, 2023, Plaintiff raised concerns to Supervisor John Tapert about the vehicle use requirement and the disparity between Plaintiff and colleague Brian Mason. In that documented Teams conversation (Exhibit 27), Tapert explicitly stated the county vehicle was 'a luxury, not a necessity' while simultaneously requiring Plaintiff to use his personal vehicle for daily multi-site travel.

35. On June 1, 2023, when Plaintiff raised concerns about being asked to perform network work outside his job description, Tapert stated in writing at 11:27 AM: 'Absolutely not Shant. You're not being asked to do other people's jobs, this IS your job.' (Exhibit 9.)

36. The very next day, June 2, 2023, Tapert sent a written email defining the precise boundaries of PC Tech network responsibilities and stating explicitly that it was 'not our expectation to do work for someone else, especially if they just aren't making the time to go out to a work location.' (Exhibit 30.) These directly contradictory statements — made on consecutive days by the same supervisor — demonstrate that the standards applied to Plaintiff were not fixed, consistent, or enforceable.

37. On June 1, 2023, Tapert made a written threat regarding vehicle use stating: 'Shant if you don't want to drive to fulfill the duties of your position... it honestly sounds like you might need to look for another position.' (Exhibit 9.)

38. On August 2, 2023, Plaintiff disclosed his diabetic condition in the workplace and requested a lunch break accommodation. This constitutes protected activity under the PWDCRA's reasonable accommodation requirements, MCL 37.1102 and MCL 37.1201.

39. On January 25, 2024, at the direction of Union President Mary Campbell, Plaintiff submitted a formal written request to HR representatives Genevieve Cox and Nina Johnson requesting an impartial independent investigation of the first disciplinary action. (Exhibit 22.) HR never acknowledged, responded to, or acted upon this request.

40. On April 2, 2024 — one day before the April 3, 2024 Brian Mason confrontation and seventeen days before Plaintiff's verbal termination — Plaintiff filed Unfair Labor Practice Charge No. 24-D-0691-CE with the Michigan Employment Relations Commission (MERC), alleging unfair labor practices based on discrimination. (Exhibit 24.)

41. On March 27, 2024, Plaintiff filed an initial EEOC inquiry, subsequently formalized as EEOC Charge No. 471-2024-03514 on July 22, 2024.

## E. The Grievance Process and Defendant's Written Admissions

42. Following the December 15, 2023 disciplinary action, Plaintiff filed a grievance through AFSCME Local 2733 (Grievance No. A-398-24) challenging the discipline as a violation of Article 10 of the Collective Bargaining Agreement.

43. On March 15, 2024, Labor Relations Director Corey Mason issued the Step III response. In the same communication, Defendant made a documented written admission: Director Mason offered in writing to settle the grievance by amending the disciplinary action to remove the three incidents that predated October 2023 from the written record. (Exhibit 17.)

44. A Letter of Understanding was subsequently prepared and signed by Defendant's representatives — including Corporation Counsel Michelle Billard, HR Executive Director Guillermo Hernandez, and Labor Relations Director Corey Mason — as well as by Union President Mary Campbell and Chief Steward Kellie Cripe. Defendant's representatives' willingness to remove three disciplinary incidents from the record constitutes a direct written admission that those incidents were indefensible.

45. Plaintiff was not a signatory to this agreement and never explicitly authorized the Union to accept the settlement on his behalf. The Brian Mason confrontation occurred on April 3, 2024, and Plaintiff was terminated on April 19, 2024 — before Plaintiff could formally contest or accept the proposed settlement.

## F. The Termination (Pretextual Retaliation)

46. On April 3, 2024, an incident occurred between Plaintiff and colleague Brian Mason. During this confrontation, Plaintiff made the statement: 'It is nice to know black people have more rights in this job than I do' — a direct challenge to the documented two-tiered disciplinary system Plaintiff had experienced throughout his employment. Plaintiff also used profanity during the confrontation. The cause of Plaintiff's conduct during this confrontation was the sustained hostile work environment Defendant

created and maintained over a period of nearly two years — including repeated unequal treatment, ignored complaints, bad-faith discipline, and a workplace atmosphere Plaintiff experienced as racially discriminatory. Plaintiff's disability accommodation needs were not at issue in this specific confrontation.

47. Plaintiff acknowledges making both the statement referencing race and the use of profanity during the April 3, 2024 confrontation. Plaintiff asserts that neither was inappropriate in context, and that both constitute protected opposition activity under the ELCRA and Title VII. The statement was a direct, factual challenge to the unequal treatment Plaintiff had documented and complained about throughout his employment. All allegations made against Plaintiff in this confrontation — including Defendant's characterization of his statements as an 'inappropriate reference to race' — are refuted in detail in Plaintiff's Rebuttal Statement submitted directly to the EEOC, documentation of which Plaintiff possesses and will produce at the appropriate stage of these proceedings. Defendant's characterization of Plaintiff's protected opposition as misconduct justifying termination is itself an act of retaliation.

48. Plaintiff was the only party placed on administrative leave following the April 3, 2024 incident. Brian Mason was not placed on administrative leave, despite Plaintiff's assertion and the union's documented concern that Mason made dismissive comments directed at Plaintiff during the same confrontation, including stating 'I don't care' in response to Plaintiff's complaints of unequal treatment and stating he would 'be glad when Plaintiff was gone.'

49. On April 19, 2024, Plaintiff was verbally terminated by Guillermo Hernandez, Executive Human Resources Director. The written termination letter was not served to Plaintiff or his Union representatives until April 24, 2024 — five days after the verbal termination. (Exhibit 28.)

50. The termination letter stated only that termination was 'for just cause due to policy violations' without specifying any policy, rule, or conduct with particularity. Union President Mary Campbell formally requested in writing on April 24, 2024 that the termination letter specify which policies were violated. Hernandez responded on April 25, 2024: 'Of course. The Non-Discrimination and Anti-Harassment Policy was violated.' Defendant could not state the specific policy basis for termination on the day it served the termination letter — only identifying it the following day when pressed in writing by Union leadership.

51. Defendant therefore used its own anti-discrimination policy as the instrument to terminate the employee who had filed an EEOC discrimination inquiry 23 days earlier on March 27, 2024, and who had engaged in documented protected opposition activity throughout his employment.

52. The stated basis for termination is pretextual for the following documented reasons:

(a) Plaintiff was the only party placed on administrative leave. Brian Mason was not placed on leave despite his conduct during the same confrontation.

(b) Mary Campbell, Plaintiff's direct local Union President of AFSCME Local 2733, confirmed on record at the termination meeting (Exhibit 6, 17:43–18:41) that she had witnessed multiple instances where employees of color used profanity, yelled, and engaged in aggressive behavior toward colleagues — including use of the N-word in the workplace — and received only counseling memos rather than termination. The same standard was not applied to Plaintiff. Shannon Seegert, Vice President of AFSCME Local 2733, confirmed the same pattern on record.

(c) Mary Campbell confirmed this pattern of practice in writing in a communication dated May 13, 2024, stating that at the Step III grievance she and Shannon Seegert had formally argued the past practice of HR and departments showing preferential treatment or lack of discipline to people of color. (Exhibit 23.)

(d) Alize Asberry Payne, Washtenaw County's Racial Equity Officer — an African American female — was found to have charged over $115,000 in county funds to personal travel expenses including trips to Germany, Caribbean wellness retreats, and luxury hotels exceeding $600 per night. She was placed on paid leave, allowed to resign with a separation agreement, and was never terminated. (Exhibit 4.) Plaintiff was terminated for a verbal workplace argument based entirely on hearsay with no corroborating witnesses.

(e) Plaintiff's conduct during the April 3, 2024 confrontation was a direct and foreseeable result of the sustained hostile work environment Defendant created and maintained over a period of nearly two years. Plaintiff had documented repeated unequal treatment, filed formal complaints, and was subjected to retaliatory discipline throughout his employment. The confrontation occurred within a workplace that Plaintiff's own Union President and Vice President independently confirmed — on record — treated employees differently based on race. Plaintiff's reaction to that environment is the direct responsibility of the employer who created it.

(f) The termination occurred 23 days after Plaintiff filed his EEOC inquiry on March 27, 2024. The temporal proximity between the protected activity and the termination is itself strong evidence of retaliation.

## G. Defendant's Position Statement Contradictions

53. On September 9, 2024, Defendant's legal counsel Miller, Canfield, Paddock and Stone, P.L.C. submitted a Position Statement to the EEOC (Exhibit 19) asserting that Plaintiff's claims fail as a matter of fact and law. That Position Statement contains multiple factual misrepresentations and internal contradictions that are directly refuted by Defendant's own documents.

54. Defendant's Position Statement simultaneously: (a) claims Plaintiff never disclosed a disability and never made a request for accommodation; and (b) states on page 8 that 'he became irate, explained that he had diabetes, and left.' Defendant thus simultaneously denies the disability disclosure while acknowledging it in the same document. This internal contradiction is fatal to Defendant's PWDCRA defense.

55. Defendant's Position Statement relied on the 'background circumstances' rule from Sutherland v. Michigan Dept. of Treasury, 344 F.3d 603 (6th Cir. 2003), requiring majority-group plaintiffs to show additional evidence that the employer discriminates against the majority. That rule was unanimously struck down by the United States Supreme Court in Ames v. Ohio Department of Youth Services, 605 U.S. ___ (June 5, 2025). Defendant's entire race discrimination defense rests on an overturned legal standard that is no longer good law.

56. Defendant claims the vehicle use requirement applied equally to all employees in the same classification. However, Plaintiff's documented communications (Exhibit 9, Teams chat June 1, 2023) show that Brian Mason, an African American colleague in the same classification, was permitted to refuse to drive to Independence Lake once every two to four weeks, while Plaintiff was required to drive 300+ miles per week to eight sites spanning up to 30 miles one way.

57. Defendant claims Plaintiff self-identified his race as 'White' at hire. Plaintiff is Middle Eastern American. The EEOC Charge (Exhibit 1) and the termination meeting transcript (Exhibit 6) both document Plaintiff's identification as Middle Eastern. Any self-identification as 'White' on an administrative form at hire does not alter Plaintiff's actual national origin or his protected status under Title VII, which covers national origin discrimination regardless of how an employer's intake form categorizes an employee.

58. When Plaintiff requested his personnel file, the response produced only three documents: (1) the signed-under-duress version of the December 15, 2023 disciplinary action; (2) Plaintiff's PARS employee information profile; and (3) a new hire checklist. Plaintiff received this file on July 8, 2024 — nearly three months after his April 19, 2024 termination. Absent from the file were: the termination letter; the unsigned version of the December 15, 2023 disciplinary action; the Corrective Action Plan; all union grievance documentation; the formal impartial investigation request; the second disciplinary action; and every other document directly relevant to Plaintiff's discrimination claims. This constitutes evidence of deliberate document curation in anticipation of litigation and spoliation.

**H. MDCR Administrative Failure**

59. Plaintiff's initial complaint was filed March 27, 2024, and formalized as EEOC Charge No. 471-2024-03514 on July 22, 2024. The EEOC held Plaintiff's charge from July 22, 2024 to April 23, 2025 — nine months — without conducting any investigation.

60. On April 23, 2025, EEOC Enforcement Manager Deanna Wooten transferred the charge to MDCR without explanation. MDCR Director of Investigations Marlene Cain assigned Investigator Damon Holmes, who took no investigative action for approximately nine to ten months.

61. On February 3, 2026 — nearly twenty months after the charge was formalized — MDCR Civil Rights Investigator Alexandra Baron made first contact with Plaintiff, giving him a ten-day deadline of February 13, 2026 to submit all evidence and resolution demands.

62. On March 13, 2026, Baron stated in writing: 'The case will not go to the Department of Justice.' (Exhibit 16.) This statement forecloses the only administrative path through which Plaintiff could obtain a DOJ-endorsed Right to Sue letter for his federal ADA claims against a government employer.

63. Plaintiff submitted MDCR FOIA Request No. 666216 seeking records related to his charge. On March 17, 2026, FOIA Coordinator Amanda Burgess denied the request citing MCL § 15.243(1)(b) — the law enforcement proceedings exemption — claiming the requested records concerned a matter currently under active investigation. However, four days earlier on March 13, 2026, MDCR Civil Rights Investigator Alexandra Baron had confirmed in writing that the investigation had not yet meaningfully commenced and could take an additional 19 months to complete. (Exhibit 16.) These two positions are irreconcilable.

64. Plaintiff filed a formal appeal of the FOIA denial on March 17, 2026 to the MDCR Director Designee, CC'd to Investigator Baron and other MDCR officials. (Exhibit 31.) As of the date of this filing, the MDCR has not responded to the appeal.

## IV. LEGAL COUNTS

**COUNT I: Failure to Accommodate — Michigan Persons with Disabilities Civil Rights Act (PWDCRA), MCL 37.1102 and MCL 37.1201**

65. Plaintiff realleges and incorporates by reference each and every allegation set forth in Sections I through III of this Complaint as if fully restated herein.

66. Plaintiff is an individual with a disability within the meaning of the PWDCRA, MCL 37.1101 et seq., specifically Type 2 Diabetes Mellitus as documented by medical records dated January 12, 2018. (Exhibit 7.)

67. Plaintiff is a qualified individual with a disability who, with or without reasonable accommodation, was capable of performing the essential functions of his position as PC Technician.

68. Defendant was directly and explicitly informed of Plaintiff's Type 2 Diabetes during the August 2, 2023 workplace incident, as set forth in Section III(C) above.

69. A consistent lunch break at a regular time is a reasonable accommodation under the PWDCRA, MCL 37.1102 and MCL 37.1201.

70. Defendant failed to provide the reasonable accommodation and failed entirely to engage in the interactive process mandated by the PWDCRA from the date of disclosure on August 2, 2023 through the issuance of the first disciplinary action on December 15, 2023 — a period of approximately four and a half months.

71. Defendant's failure to accommodate Plaintiff's disability and failure to engage in the interactive process constitute violations of the PWDCRA, MCL 37.1102 and MCL 37.1201, entitling Plaintiff to damages, including back pay, front pay, compensatory damages, punitive damages, and attorney fees.

**COUNT II: Retaliation — Michigan PWDCRA, MCL 37.1602, and Michigan ELCRA, MCL 37.2701**

72. Plaintiff realleges and incorporates by reference each and every allegation set forth in Sections I through III of this Complaint as if fully restated herein.

73. Plaintiff engaged in the following protected activities: (a) disclosing his disability and requesting an accommodation on August 2, 2023; (b) filing internal complaints about unequal treatment; (c) filing an EEOC inquiry on March 27, 2024; and (d) filing MERC Unfair Labor Practice Charge No. 24-D-0691-CE on April 2, 2024.

74. Plaintiff was terminated on April 19, 2024 — directly and proximately following the filing of his March 27, 2024 EEOC inquiry, a period of only 23 days.

75. The temporal proximity between Plaintiff's protected activity and the adverse employment action constitutes strong evidence of retaliatory motive.

76. The stated reasons for termination are pretextual as documented in Section III(F) above.

77. Defendant's termination of Plaintiff following his protected activities constitutes unlawful retaliation in violation of the PWDCRA, MCL 37.1602, and the ELCRA, MCL 37.2701, entitling Plaintiff to damages.

**COUNT III: Disparate Treatment and Hostile Work Environment — Michigan ELCRA, MCL 37.2101 and MCL 37.2202 (Race/National Origin)**

78. Plaintiff realleges and incorporates by reference each and every allegation set forth in Sections I through III of this Complaint as if fully restated herein.

79. Plaintiff is a Middle Eastern American male, a protected class under the ELCRA, MCL 37.2202.

80. Plaintiff was subjected to different terms and conditions of employment than his African American colleagues, including the following:

(g) Unequal application of vehicle-use requirements: Plaintiff was required to use his personal vehicle for 300+ miles of weekly travel to eight sites; Brian Mason, an African American colleague in the same classification, was permitted to refuse comparable travel requirements without discipline.

(h) Unequal disciplinary standards: colleagues of color who used profanity and engaged in aggressive behavior received counseling memos; Plaintiff was terminated for lesser or equivalent conduct.

(i) Plaintiff's internal complaints about these disparities were ignored or used against him in subsequent disciplinary proceedings.

81. Washtenaw County has a documented prior history of racial discrimination: in Ali Aboubaker v. Washtenaw County, No. 2:11-cv-13001 (E.D. Mich. 2014), a federal jury awarded $1,185,520.10 against the County for race, national origin, and religious discrimination against a Middle Eastern employee — a case with direct factual parallels to Plaintiff's claims. (Exhibit 14.)

82. Defendant's conduct as set forth herein constitutes disparate treatment based on race and national origin in violation of the ELCRA, MCL 37.2101 and MCL 37.2202, entitling Plaintiff to damages.

83. In Ames v. Ohio Department of Youth Services, 605 U.S. ___ (June 5, 2025), the unanimous U.S. Supreme Court held that Title VII's disparate treatment provision imposes the same prima facie evidentiary burden on majority-group plaintiffs as on minority-group plaintiffs. No heightened burden or proof of 'background circumstances' may be required of Plaintiff based on his demographic status.

**COUNT IV: Supremacy Clause Preemption — PWDCRA 182-Day Written Notice Requirement Preempted by Federal ADA**

84. Plaintiff realleges and incorporates by reference each and every allegation set forth in Sections I through III of this Complaint as if fully restated herein.

85. Under the Supremacy Clause of the United States Constitution, Article VI, Clause 2, federal law is the supreme law of the land and state laws that conflict with federal law are preempted and unenforceable.

86. The Michigan PWDCRA's 182-day written notice requirement, MCL 37.1502, conflicts with and is preempted by the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. The ADA contains no written notice requirement and imposes no specific timeframe or form for disability disclosure. The ADA's protections are triggered by employer awareness of a disability through any means — including verbal disclosure, observable symptoms, or third-party knowledge.

87. A state law that imposes a written notice requirement more burdensome than federal law, and that operates to extinguish a disability discrimination claim that would otherwise be cognizable under the ADA, directly conflicts with the ADA's remedial purpose and is preempted under the Supremacy Clause.

88. Independently, Plaintiff provided actual direct witnessed notice of his disability and accommodation need on August 2, 2023 — verbally to Di Shi and Justin Vidaurri in the presence of witnesses, and subsequently reported to Supervisor John Tapert who acknowledged it in writing. Actual direct notice satisfies the intent of MCL 37.1502.

**COUNT V: Retaliation for Opposing Discriminatory Practices — Michigan ELCRA, MCL 37.2701**

89. Plaintiff realleges and incorporates by reference each and every allegation set forth in Sections I through III of this Complaint as if fully restated herein.

90. The ELCRA protects employees who oppose employment practices they reasonably believe to be discriminatory. MCL 37.2701.

91. During the April 3, 2024 workplace confrontation, Plaintiff made the statement 'It is nice to know black people have more rights in this job than I do' directly to Brian Mason — a direct act of protected opposition to the documented two-tiered disciplinary system.

92. Separately, the statement 'Is my skin not the right color?' was first made by Plaintiff in writing in his Rebuttal Statement to the first disciplinary action (Exhibit 8) as a direct written challenge to management regarding the vehicle use disparity between Plaintiff and Brian Mason.

93. Both statements constitute protected opposition activity under the ELCRA, MCL 37.2701.

94. Defendant terminated Plaintiff for his protected opposition to documented discrimination while declining to discipline Mason for his role in the same confrontation. This constitutes unlawful retaliation under the ELCRA, MCL 37.2701.

**COUNT VI: Sex Discrimination — Disparate Treatment — Michigan ELCRA, MCL 37.2101 and MCL 37.2202**

95. Plaintiff realleges and incorporates by reference each and every allegation set forth in Sections I through III of this Complaint as if fully restated herein.

96. Plaintiff is a heterosexual biological male who self-identifies as a man.

97. At one of Plaintiff's assigned work sites — the Youth Center, 2140 E. Ellsworth CMH Building — Defendant placed an 'All Gender' sign over the men's restroom sign while leaving the women's restroom designated exclusively for women. Plaintiff documented this disparity on video at the time of his employment. (Exhibit 10.)

98. This policy was applied unequally based on biological sex — biological males lost their sex-segregated restroom while biological females retained theirs.

99. The Michigan Supreme Court confirmed in Rouch World LLC v. Department of Civil Rights (2022) that ELCRA's sex discrimination prohibition encompasses sexual orientation and gender identity.

100. Defendant's unequal application of its gender identity restroom policy — removing sex-segregated facilities from biological males while preserving them for biological females — constitutes disparate treatment based on sex under ELCRA, MCL 37.2101 and MCL 37.2202.

## COUNT VII: Defamation — Libel Per Se and Slander Per Se (Michigan Common Law)

101. Plaintiff realleges and incorporates by reference each and every allegation set forth in Sections I through III of this Complaint as if fully restated herein.

102. Defendant made false statements of fact regarding Plaintiff's professional conduct, character, and behavior that were communicated to third parties including Human Resources, Labor Relations Director Corey Mason, Corporation Counsel Michelle Billard, and union representatives.

103. The written disciplinary actions and termination letter contain false statements of fact characterizing Plaintiff as insubordinate, confrontational, dishonest, and professionally incompetent. These written statements were communicated permanently to Plaintiff's personnel file and to multiple third parties. Under Michigan common law, false written statements imputing professional incompetence or misconduct constitute libel per se, meaning damages are presumed without requiring Plaintiff to prove specific financial loss.

104. The verbal statements made during disciplinary and termination proceedings — recorded and transcribed in Exhibit 6 — falsely characterizing Plaintiff's conduct as aggressive, racist, and professionally unacceptable, and communicated to multiple third parties, constitute slander per se under Michigan common law.

105. Defendant's malicious intent is evidenced by its refusal to acknowledge or respond to Plaintiff's documented requests that both parties submit to a polygraph examination to establish the verifiable truth of the disputed allegations. A party acting in good faith and confident in the truth of its own allegations has no basis to refuse multiple requests to verify those allegations. Defendant's complete silence in response to every such request is direct evidence that Defendant knew or recklessly disregarded that its allegations against Plaintiff were false.

## COUNT VIII: Violation of Constitutional Due Process — 14th Amendment and Michigan Constitution (MDCR Administrative Failure)

106.    Plaintiff realleges and incorporates by reference each and every allegation set forth in Sections I through III of this Complaint as if fully restated herein.

107.    The MDCR is a Michigan state agency and its conduct is governed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 17 of the Michigan Constitution.

108.    The MDCR's process excludes the claimant (Plaintiff) from personally participating in the conciliation conference. This denies Plaintiff the right to be heard at a critical adjudicatory stage — one in which the evidence has already been found 'sufficient' to support a charge of discrimination. This exclusion deprives Plaintiff of a meaningful opportunity to be heard before a decision affecting his legal rights is made.

109.    Administrative Rule 37.5(2) prohibits disclosure of anything that transpires during MDCR conciliation, preventing Plaintiff from knowing what defenses Defendant raised, what admissions Defendant made, or what evidence was considered. This asymmetry of information is fundamentally inconsistent with due process.

110.    The MDCR's invocation of an active investigation exemption to deny Plaintiff's FOIA request, while simultaneously acknowledging in writing that no meaningful investigation had commenced, meets the standard for arbitrary and capricious denial under MCL § 15.240.

111.    The right to timely adjudication of a civil rights claim constitutes a protected property interest under the 14th Amendment. The Michigan state statute of limitations for Plaintiff's state civil rights claims expires in June 2026. The MDCR has failed to complete its investigation within its own mandated 180-day timeframe, and as of the date of this filing, nearly two full years have elapsed since Plaintiff's complaint was filed.

112.    The combined inaction of three separate administrative bodies — EEOC, MDCR, and MERC — each charged with protecting the rights of employees in Plaintiff's position, each failing to act within their own mandated timelines, has left Plaintiff with no remedy other than this Court.

## V. RELIEF REQUESTED

WHEREFORE, Plaintiff Shant A. Temirian Jr. respectfully requests that this Court enter judgment in his favor against Defendant Washtenaw County Government and grant the following relief:

113.    Compensatory Damages in the amount of $2,750,000, covering: (a) back pay from April 19, 2024 through the date of judgment; (b) front pay for future lost earnings and diminished earning capacity; (c) special damages for defamation of Plaintiff's professional and personal integrity; and (d) damages for severe and ongoing mental and emotional distress, including anxiety requiring prescription medication

(Citalopram, subsequently Hydroxyzine), which Plaintiff continues to take as a direct result of the hostile work environment and wrongful termination;

114.    Punitive Damages, based on Defendant's deliberate denial of disability accommodations, application of a two-tiered disciplinary system, retaliatory termination, the County's prior history of racial discrimination (Aboubaker v. Washtenaw County, $1,185,520.10 jury verdict), and bad faith conduct in pre-litigation settlement negotiations demonstrating malice or reckless indifference to Plaintiff's protected rights;

115.    Injunctive Relief: an order compelling the MDCR to immediately issue a final determination and to transmit Plaintiff's file to the United States Department of Justice. Under the enforcement structure of the Americans with Disabilities Act as applied to public entities, the U.S. Department of Justice is the sole federal agency with authority over ADA Title II claims against government employers, and the sole agency with authority to issue an endorsed Right to Sue letter for such claims — without which no private law firm will accept Plaintiff's federal ADA claims on a contingency basis. Neither the EEOC nor the MDCR holds authority to issue an enforceable Right to Sue letter against a government employer, nor to file suit against a government employer. Any action or statement by either agency purporting to foreclose Plaintiff's federal ADA rights constitutes an unauthorized overreach of jurisdictional boundaries. Plaintiff further requests that this Court issue a declaratory order to that effect;

116.    Declaratory Judgment: a ruling that the MDCR's 700+ day investigation delay and the exclusionary and confidential nature of its conciliation process, as applied to this Plaintiff, violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 17 of the Michigan Constitution;

117.    FOIA Punitive Damages: under MCL 15.240, an award of $1,000 for the arbitrary and capricious denial of Plaintiff's FOIA request;

118.    Attorney Fees and Costs pursuant to MCL 37.2801 (ELCRA) and MCL 37.1606 (PWDCRA);

119.    Such other and further relief as this Court deems just and equitable.

## VI. DEMAND FOR JURY TRIAL

Pursuant to Michigan Court Rule 2.508, Plaintiff Shant A. Temirian Jr. hereby demands a trial by jury on all counts and issues so triable in this action. This demand applies to all claims, all counts, and all issues triable by jury.

## PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE

Respectfully submitted,


/s/ Shant A. Temirian Jr.

Shant A. Temirian Jr., Pro Se

29980 Montmorency Drive

Novi, MI 48377

Phone: 248-495-5688

Email: omsstaff96@gmail.com

Date: _____

## EXHIBIT LIST

Exhibit 1 — Charge of Discrimination No. 471-2024-03514 (Initial complaint filed March 27, 2024; formalized with EEOC July 22, 2024)

Exhibit 2 — Termination Letter from Guillermo Hernandez, Washtenaw County HR (April 19, 2024)

Exhibit 3 — Recordings of April 17, 2024 Investigatory Meeting and April 19, 2024 Termination Meeting

Exhibit 4 — MLive Article: "Equity Officer Investigated for Travel Expenses Resigns in Washtenaw County" (August 27, 2024)

Exhibit 5 — Additional News Coverage of Alize Asberry Payne Resignation

Exhibit 6 — Full Transcript of Termination Meeting (April 19, 2024) — YouTube: https://youtu.be/gV6-HlpgWwQ

Exhibit 7 — Medical Records, Henry Ford Health (January 12, 2018): Type 2 Diabetes Diagnosis

Exhibit 8 — Plaintiff's 17-Page Rebuttal Statement to First Disciplinary Action

Exhibit 9 — John Tapert Written Threat (Teams Chat Log, June 1, 2023)

Exhibit 10 — Video: Youth Center Restrooms, 2140 E Ellsworth CMH Building — YouTube: https://youtube.com/shorts/QlYCQEmMqJ8

Exhibit 11 — Documentation of Lost Wages and Job Search Records (251 Applications)

Exhibit 12 — Credit History / Credit Score Documentation (TransUnion via Credit Karma, March 9, 2026)

Exhibit 13 — Proof of Current Income (Outback Steakhouse)

Exhibit 14 — Jury Verdict: Ali Aboubaker v. Washtenaw County, No. 2:11-cv-13001 (E.D. Mich. February 27, 2014) — $1,185,520.10 Award

Exhibit 15 — Ames v. Ohio Department of Youth Services, 605 U.S. ___ (June 5, 2025) — Supreme Court Opinion

Exhibit 16 — MDCR Email: Alexandra Baron (Civil Rights Investigator) to Shant Temirian, March 13, 2026

Exhibit 17 — Step III Grievance Response and Letter of Understanding, March 15, 2024

Exhibit 18 — Shant Temirian Rebuttal MkII

Exhibit 19 — Miller, Canfield, Paddock and Stone P.L.C. Position Statement to EEOC, September 9, 2024

Exhibit 20 — Plaintiff's Rebuttal to Miller Canfield Position Statement

Exhibit 21 — Signed-Under-Duress Version of December 15, 2023 Oral Warning / Corrective Action Plan

Exhibit 22 — January 25, 2024 Email: Plaintiff to Genevieve Cox and Nina Johnson (HR) — Formal impartial investigation request

Exhibit 23 — May 13, 2024 Email: Mary Campbell (AFSCME 2733 President) written confirmation of discriminatory past practice

Exhibit 24 — MERC ULP Charge 24-D-0691-CE

Exhibit 25 — EEOC Inquiry No. 471-2024-03514 — Initial EEOC inquiry filed March 27, 2024

Exhibit 26 — Plaintiff's Personnel File as Produced by Defendant (three documents, July 8, 2024)

Exhibit 27 — John Tapert Teams Chat Log, May 15, 2023 — Vehicle use dispute

Exhibit 28 — Employment Termination Letter Email Chain, April 24–25, 2024

Exhibit 29 — EEOC Transfer and MDCR Administrative Failure Documentation

Exhibit 30 — John Tapert Written Definition of PC Tech Responsibilities, June 2, 2023

Exhibit 31 — MDCR FOIA Request No. 666216 Appeal, March 17, 2026